STATE OF HAWAII, Plaintiff-Appellee *v.* FUIAVAILILI
TAPUA ALO, Defendant-Appellant

NO. 5746

DECEMBER 28. 1976

RICHARDSON. C.J.. KOBAYASHI, OGATA,
MENOR AND KIDWELL, JJ.

OPINION OF THE COURT BY MENOR, J.

The defendant was indicted for the crime of attempted murder, in violation of HRS §§ 705-500 and 707-701 (1975 Special Supp.). He was convicted of the offense by a jury and was sentenced by the trial court to life imprisonment with possibility of parole. HRS § 706-606 (1975 Special Supp.). From the judgment and sentence, the defendant appeals. He predicates his appeal upon three principal grounds:

1. That the trial court erred in denying his motion for a mental examination pursuant to HRS § 704-404 (1975 Special Supp.).

2. That the trial court erred in permitting the prosecution, over the objection of defense counsel, to cross-examine the defendant on his failure to inform police interrogators following his arrest of certain exculpatory matters about which he testified at trial.

3. That the sentence imposed by the trial court was in violation of the sentencing provisions of the Hawaii Penal Code.

I

On the question of whether the trial court erred in failing to order a mental examination before proceeding to trial, pursuant to HRS § 704-404 (1975 Special Supp.), we find no error. The statute provides:

(1) Whenever the defendant has filed a notice of intention to rely on the defense of physical or mental disease, disorder, or defect excluding responsibility, or there is reason to doubt his fitness to proceed, or reason to believe that the physical or mental disease, disorder, or defect of the defendant will or has become an issue in the case, the court may immediately suspend all further proceedings in the prosecution. If a trial jury has been empanelled, it shall be discharged or retained at the discretion of the court. The dismissal of the trial jury shall not be a bar to further prosecution.

(2) Upon suspension of further proceedings in the prosecution, the court shall appoint a State-employed physician or certified clinical psychologist designated by the director of health from within the department of health and two additional unbiased, qualified physicians, or one qualified physician and one certified clinical psychologist, to examine and report upon the physical and mental condition of the defendant.

Defense counsel had moved prior to trial for a mental examination of the defendant, expressing her belief that the defendant was in need of a mental examination to determine his "mental condition at the time of the alleged offenses and at the present time, and the existence of any mental or emotional defect which would affect defendant's penal responsibility and fitness to proceed." This motion was not a notice of intention to rely on the defense of mental irresponsibility as required by the statute.[1] And in any event, the motion was addressed to the sound discretion of the trial court. HRS § 704-404 (1975 Special Supp.).[2] See also HRS § 704-405 (1975 Special Supp.); 1973 House Journal, Stand. Comm. Rep. No. 726; 1973 Senate Journal, Stand. Com. Rep. No. 858.

The motion was heard by the court prior to trial, and in its denial of the motion, we find no abuse of its discretion. Neither did the trial court err in declining sua sponte to order a mental examination prior to sentencing the defendant.

---

[1] At the hearing on the motion, defense counsel herself was not insistent upon the full invocation of HRS § 704-404 (1975 Special Supp.):

[MISS CHU]: Although the defendant has been very cooperative and cordia with me. I'm not trained to determine whether or not there are any mental disease or disorder on the part of the defendant and for that reason, I would not object to perhaps the court ordering one psychiatrist to examine the defendant to deter mine whether or not there is sufficient basis to empanel members of — o. three-member psychiatric panels to examine the defendant.

[2] The matters set forth in the supplements to the last revision of the laws of Hawaii are prima facie evidence of the law. HRS § 2-6.

II

The trial judge allowed the prosecution, over the objection of defense counsel, to ask the defendant as to whether he had told the police of certain exculpatory matters about which he testified at trial. The defendant claims reversible error.

The victim in this case testified that the defendant had beaten her in their apartment and had then forced her to go with him in his car to a deserted area below the Pali where he had shot her and then driven away. Sometime later Officer Cameron W. Deal came upon the scene, and she went up to him for assistance. The officer immediately called for an ambulance and notified police headquarters. It was then approximately 12:55 a.m., on February 10, 1974. The defendant's name and description was broadcast over police radio to officers on duty, and at approximately 3:15 a.m., Officer Michael Lupenui stopped the defendant as the latter was walking toward his apartment building and placed him under arrest.

After the defendant was taken to the police station. he was given his *Miranda* warnings by Detective Spencer Springer. He elected not to give a statement. At time of trial the defendant took the witness stand in his own behalf. On direct examination, he readily admitted having an argument with his girl friend and described how he kicked her. He disclaimed any knowledge or involvement in the shooting, however, by further testifying on direct examination:

Q. And then what happened?

A. And then I just slammed the door and I went out for a walk to cool off.

Q. And then what happened after you went out for a walk? Where did you go in Waikiki?

A. I just — I just wanted to walk any place just to — just to calm my nerves. I just wanted to get peace of mind where I can get things together about the argument that we had earlier.

Q. *I see. And then what is the next thing that you remember?*

A. *Well, on my way back to the apartment, the police officer stopped me.*

Q. *And what happened?*

A. *And he asked me, "Where is your girl friend?" I told him, "Where is she? I thought she was in the apartment." And then he told me, "You know what happened," and I told him, "I don't know. I just came back from a walk." And then he put the handcuffs on me and he took me downstairs.* (Emphasis added)

The foregoing was the exculpatory testimony, which became the focus of the subsequent cross-examination by the prosecution:

Q. Mr. Alo, at the time that you talked to or Detective Springer talked to you, had you told any police officer what you told us today?

A. No, I didn't.

Q. Since talking to Detective Springer, have you told any police officers, police department, the story you have told us today?

A. I don't recall.

* * * *

Q. Mr. Alo, when you talked to Detective Springer did you tell him the story that you told us this afternoon?

A. No. I didn't.

MISS CHU: Your Honor, —

THE WITNESS: I don't remember.

MISS CHU: — I would again object to this line of questioning regarding defendant's assertion of his right to remain silent.

THE COURT: Overruled.

Q. (by Mr. Yamamoto) What was your answer, Mr. Alo?

A. I don't remember.

Q. You mean to say, Mr. Alo, that you are accused of the crime of attempted murder and you don't recall whether you talked to any police officers after you were arrested?

A. I knew I talked to a police officer. I don't recall his name.

Q. You explained to him that you weren't the one, Mr. Alo? You didn't do that?

A. I didn't do it.

Q. Have you convinced yourself of that, Mr. Alo?

A. What you mean by that question?

Q. You don't understand the question?

A. I just didn't do it.

Q. I see.

The defendant on direct examination disclaimed any knowledge of the shooting and claimed to have told the arresting officer (whose name he could not recall) that he did not know what had happened to his girl friend, the victim, and that he had just come back from a walk. Whether he in fact made this self-serving statement to the police became, thereafter, a legitimate subject of inquiry on cross-examination.

The approach taken by the prosecutor was entirely proper. He was not bound to follow a strict and rigid formula on cross-examination. Initially, he inquired of the defendant whether he had told his story to any police officer before talking to Detective Springer who had given him the *Miranda* warnings. When the defendant answered, "No, I didn't" (this in spite of his assertion to the contrary on direct examination), the prosecutor then followed up with the question of whether he had given his version to any other police officer after talking to Detective Springer. When the defendant replied, "I don't recall," it was only then that the prosecutor asked him if he had given it to Detective Springer.

Obviously, the prosecution was not bound to accept as true the defendant's testimony on direct examination. Neither was its right to cross-examine restricted solely to the contents of the alleged exculpatory statement. The prosecution had the right to determine whether and exactly to whom the defendant was supposed to have given his exculpatory version. If it was not made to any officer before or after his interview with Detective Springer, as his answers appeared

to indicate, then was it to the latter that the defendant had given it? Or had he given it to the police at all?

The initial questions had a legitimate tendency to test the memory and the veracity of the witness, and the question involving Detective Springer, in view of the defendant's answers to the preceding questions, went to the credibility issue of whether he had in fact given his exculpatory version to the police as he claimed he did. The questions asked on cross-examination were a natural and logical sequel to the defendant's testimony on direct examination. Objectively appraised, the thrust of the prosecution's examination was not calculated to penalize the defendant for his silence in the face of custodial interrogation after he had been given the *Miranda* warnings. *Compare, Doyle v. Ohio*, 426 U.S. 610 (1976); *United States v. Hale*, 422 U.S. 171 (1975); *Buchanan v. State*, Okl. Cr., 523 P.2d 1134 (1974); *State v. Morales*, 127 N.J.Super. 1 (1974); *State v. Griffin*, 120 N.J.Super. 13 (1972). For that matter, the defendant's final answer to the question of whether he had given his exculpatory version to Detective Springer was, "I don't remember." In the light of his answers on cross-examination, it is not entirely clear, at least from the testimonial record, whether and to whom he had made the alleged exculpatory statement. Officer Michael Lupenui, the arresting officer who was called by the prosecution in its case in chief, had not testified that he did. Detective Springer did not testify at trial. Under the circumstances of this case, we hold that there was no error.

There is nothing more basic and more fundamental than that the accused has a constitutional right to remain silent, and the exercise of this privilege may not be used against him. *Miranda v. Arizona*, 384 U. S. 436 (1966). And even where he elects to testify in his own defense, his post-arrest silence may not be used solely to impeach his exculpatory testimony. *Doyle v. Ohio, supra; United States v. Hale, supra*. But this was not the case here. We also take this occasion to observe that there have been other limited situations where inquiry into the accused's prior silence has been held to be proper. *See United States v. Fairchild*, 505 F.2d 1378 (5th Cir. 1975);

*United States v. Griffin*, 530 F.2d 101 (5th Cir. 1976); *Doyle v. Ohio, supra; State v. Morales, supra. See also Neal v. State,* Okl. Cr., 529 P.2d 526 (1974).

In *Fairchild,* the defendant had attempted to create the impression that following his arrest he had cooperated fully with the law enforcement authorities. In rebuttal the prosecution adduced testimony that he had elected to remain silent after being given the *Miranda* warnings. In holding the testimony to be proper, the court stated:

> "*Miranda* establishes that the prosecution may not use as a part of its case in chief a criminal defendant's silence following his arrest and warning. This evidence, even though it might be relevant and probative, is normally excluded. But it is important to note that it is excluded for the purpose of protecting certain rights of the defendant. It is not excluded so that the defendant may freely and falsely create the impression that he has cooperated with the police when, in fact, he has not. . . . Having thus raised the question of his cooperation with the law enforcement authorities, Fairchild opened the door to a full and not just a selective development of that subject." 505 F.2d at 1383.

In *Doyle,* the defendants had been given the *Miranda* warnings at the time of their arrest. At trial they took the witness stand and gave an exculpatory story that they had not previously told the police. Over their counsel's objections, they were cross-examined as to why they had not given the arresting officer the exculpatory explanations. The Supreme Court reversed, holding that the use of the defendants' post-arrest silence for impeachment purposes, after they were given the *Miranda* warnings, violated the Due Process Clause. In so doing, however, the Supreme Court tacitly approved the use of post-arrest silence by the prosecution in the *Fairchild* situation, and further noted:

> "It goes almost without saying that the fact of post-arrest silence could be used by the prosecution to contradict a defendant who testifies to an exculpatory version of events and claims to have told the police the same version

upon arrest. In that situation the fact of earlier silence would not be used to impeach the exculpatory story, but rather to challenge the defendant's testimony as to his behavior *following arrest*." 96 S. Ct. at 2245, fn 11.

## III

Relying apparently upon the statement of the law in the pre-sentence report, and no question having been raised by either the defense or by the prosecution as to his authority to do so, the trial judge sentenced the defendant to life imprisonment with possibility of parole. This was in seeming conformity with the provisions of HRS § 705-502 (1975 Special Supp.) and HRS § 707-701 (1975 Special Supp.). HRS § 705-502 (1975 Special Supp.) specifies that "[a]n attempt to commit a crime is an offense of the same class and grade as the most serious offense which is attempted." HRS § 707-701 (1975 Special Supp.) provides that the crime of murder shall be punishable in the manner and to the extent set forth in HRS § 706-606 (1975 Special Supp.). That section of the law in turn provides, in pertinent part, that the penalty for the offense shall be imprisonment for life with possibility of parole or twenty years, as the court shall determine.

The Commentary on HRS § 705-502 (1975 Special Supp.), however, gives the following explanation:

For purposes of sentencing, the Code equates the criminal attempt with the most serious substantive offense attempted. Only in the case where the crime attempted is murder does the Code authorize a different sentence for the substantive offense than for the attempt. This is because § 706-606 provides a special sentence for murder. *Attempted murder is treated as an ordinary class A felony*. (Emphasis added)

The maximum penalty for a class A felony is imprisonment for twenty years. HRS § 706-660 (1975 Special Supp.). We are satisfied that the commentary while not evidence

thereof, *see* Act 163, Session Laws of Hawaii, 1975, is nevertheless expressive of the legislative intent.

Accordingly, the sentence of imprisonment for life with possibility of parole heretofore imposed by the trial judge is set aside, and the cause is remanded for resentencing purposes consistent with this opinion and with the Hawaii Penal Code.

*Jeffrey A. Wayne*, for defendant-appellant.

*Dale W. Lee*, Deputy Prosecuting Attorney (*Maurice Sapienza*, Prosecuting Attorney, of counsel) for plaintiff-appellee.

## DISSENTING OPINION OF KIDWELL. J.. WITH WHOM OGATA. J., JOINS

Recognizing, as I must, the authority of the United States Supreme Court to declare the minimum standards of constitutional due process, I must dissent from the conclusion reached in Part II of the majority opinion. *Doyle v. Ohio*, 426 U.S. 610 (1976), categorically establishes that it is fundamentally unfair and a deprivation of due process to allow an arrested person's silence after receipt of Miranda warnings to be used to impeach an exculpatory explanation subsequently offered at trial. In that case the court pointed out. by footnote, that where the defendant claims to have told the police upon arrest the same exculpatory version of events to which he testifies at trial, his actual behavior following arrest may be shown to contradict the version of his behavior at that time to which he has testified, though not to impeach the exculpatory story. The majority seizes upon this footnote. but the facts do not permit its application in the case before us.

Here the defendant claimed. on trial. to have made a statement to the arresting officer before the arrest was made, in which he said that he had just come back from a walk and did not know where the victim was or what had happened to her. The defendant also testified at length with respect to his

doings at the time of the crime. It was brought out that the defendant had received Miranda warnings following his arrest and had been interrogated by Detective Springer. On cross-examination. the prosecution asked the defendant whether, at the time he talked to Detective Springer, he had told any police officer "what you told us today". The defendant answered in the negative. He was then asked whether he had told "the story you have told us" to Detective Springer or to any police officer since talking to Detective Springer. To repeated questions along this line the defendant answered either negatively or that he did not remember.

There can be no doubt that these questions were asked for the purpose of impeaching the defendant's testimony. Only the first of the line of questions, that dealing with whether he had told his story to any police officer *before* talking with Detective Springer, tended in any way to contradict any testimony of the defendant with respect to his behavior upon arrest. Since his exculpatory testimony included his version of his responses to the arresting officer's questions before receiving his Miranda warning. the rule of *Doyle v. Ohio* does not apply to that question. But when the prosecution went on to probe into his silence after receipt of the Miranda warning there was no testimony of the defendant which could possibly be contradicted thereby. since he had given no testimony as to his behavior after arrest. This part of the cross-examination had no purpose other than to impeach the defendant's testimony by showing that he had conducted himself in a manner inconsistent with the credibility of his testimony. in that he had remained silent when his natural inclination, assuming the truth of his testimony, would have been to tell his story. This is precisely what *Doyle v. Ohio* proscribes.

Since I am not able to conclude that this constitutional error was harmless beyond a reasonable doubt, *State v. Pokini.* 57 Haw 26. 548 P 2d 1102 (1976) I would reverse the judgment of conviction and remand for a new trial.