**Fuiavailili T. ALO, Plaintiff,**

v.

**Antone OLIM, Individually, and in his capacity as Superintendent of the Hawaii State Prison, Defendant.**

**Civ. No. 77–0413.**

United States District Court,
D. Hawaii.

Sept. 21, 1979.

Ronald M. Yonemoto, Deputy Public Defender, Donald K. Tsukiyama, Public Defender, Honolulu, Hawaii, for plaintiff.

Michael A. Lilly, George Yamamoto, Deputy Attys. Gen., Wayne Minami, Atty. Gen., Honolulu, Hawaii, for defendant.

OPINION AND ORDER

SAMUEL P. KING, Chief Judge.

Petitioner filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254 (1976), alleging that certain rights guaran-

teed by the Constitution of the United States had been denied him. Petitioner was found guilty of attempted murder, and his conviction was affirmed by the Supreme Court of Hawaii, *State v. Alo,* 57 Haw. 418, 558 P.2d 1012 (1976), *cert. denied,* 431 U.S. 922, 97 S.Ct. 2193, 53 L.Ed.2d 235 (1977). He makes four contentions in his petition. His first claim is that the prosecutor improperly cross-examined and impeached him with his post-*Miranda* warning silence. His second claim is that he lacked substantial capacity to commit the crime with which he was charged, and that he was tried while unable to comprehend the nature of the proceedings against him. His third claim is that he was denied effective assistance of counsel because of the unavailability of psychiatric testimony regarding his mental capacity. His final claim is that he was denied equal protection under the law, because he could not afford to hire a psychiatrist and the court refused to order a mental examination despite his indigency.

The last two claims were not raised at any stage of the state proceedings, and hence this Court may not consider them now. Because of this Court's disposition of the first claim, it need not reach the second claim relating to petitioner's mental condition. This Court does note, however, that upon retrial the Circuit Court may wish to order a mental examination for petitioner.

At petitioner's trial, the victim, a licensed masseuse at the Beach Massage Parlor, testified that she was the petitioner's girlfriend, and at the time of the attack had been living with him in an apartment in Honolulu. On February 9, 1974, she and petitioner had gone to the beach during the day and had quarrelled, ostensibly over where they would sit. At about eleven-thirty that evening they were at home watching television when the phone rang. Mr. Alo talked on the phone and then went out for about thirty minutes. When he returned he was apparently very angry and began to scream obscenities at his girlfriend, Ms. Ramos. Ms. Ramos said Alo called her names and said he was going to kill her. He then pulled out a .38, threw her off the bed, kicked her in the face and

chest, and punched her in the eye. Following this, he allegedly forced her at gun point to walk to his car. Ms. Ramos stated that Alo drove onto the freeway, out the Pali Highway, through the Pali tunnels, and up the road behind the Old Pali Golf Course. Alo then allegedly drove off the road and pushed Ms. Ramos out of the car so that she was lying on her stomach and right side. She stated that she then heard three shots, and felt her right side and right arm being driven into the ground. Ms. Ramos testified that she started walking on the road toward Kaneohe and spotted a police car coming toward her. She flagged down the car and was taken by the officer to a hospital. She was at one point in critical condition, and had several operations, including one for a collapsed lung. Two slugs were removed from her body.

The officer who discovered Ms. Ramos stated that she told him she had been shot by an unknown male. He also testified she was delirious and in shock. An officer who interviewed Ms. Ramos at the hospital testified without objection by Ms. Chu, Alo's attorney, that Ms. Ramos told him "Fui" Alo was her assailant.

Officer Michael Lupenui testified that he was ordered to go to Mr. Alo's residence at about 2:30 A.M. on February 10th. He stated that two people were in Alo's apartment but that Alo was not present. As he was about to leave, he saw Alo walking toward him. After conferring with his supervisors Officer Lupenui placed Alo under arrest for attempted murder. Lupenui testified Alo appeared sober and "calm, very calm."

The State produced evidence that the two spent bullets removed from Ms. Ramos were fired by a .38. In addition, two paraffin casts made on petitioner's hands soon after he was arrested showed the presence of dermal nitrates. The State's expert testified that there was a possibility that petitioner's hands had been contaminated from sources other than gunpowder, but that the pattern of the dermal nitrates clearly indicated that gunpowder was the source. Re-

sponding to questions from the court, the expert testified that all he could say was that the dermal nitrates had been associated with gunpowder discharge. He would not draw any conclusions with respect to firearms.

A surgeon who performed one operation on Ms. Ramos testified that one bullet was probably shot from behind, into her back. A second bullet apparently entered to the right of the right breast and lodged in the right arm. The surgeon testified that this shot could have been fired downward at someone lying on the ground, partially on her right side, partially on her stomach. It also could have been fired from the front. A detective testified that a thorough search of the scene of the alleged assault turned up no signs of a shooting—no slugs or spent cartridges. No gun was found either, and the prosecution introduced no testimony linking the petitioner with a .38.

The only witness for the defense was Mr. Alo himself. He testified that he had argued with Ms. Ramos as to where to sit on the beach, and that on the evening of September 9th he had gone out for a short while. He testified that upon his return Ms. Ramos was bothering him so he "kicked her in the face." Mr. Alo testified he then slammed the door and went for a walk. He stated that the next thing he remembered was that on the way back to the apartment a police officer stopped him. Petitioner's counsel then asked:

Q   And what happened?

A   And he asked me, "Where is your girl friend?" I told him, "Where is she? I thought she was in the apartment." And then he told me, "You know what happened," and I told him, "I don't know. I just came back from a walk." And then he put the handcuffs on me and he took me downstairs. (Tr. at 186).

The following are relevant portions of the State's cross-examination of the petitioner.

Q   Mr. Alo, at the time that you talked to or Detective Springer talked to you, had you told any police officer what you told us today?

A   No, I didn't.

Q   Since talking to Detective Springer, have you told any police officers, police department, the story you have told us today?

A   I don't recall. (Tr. at 194–95).

Q   Mr. Alo, when you talked to Detective Springer did you tell him the story that you told us this afternoon?

A   No, I didn't.

MISS CHU: Your Honor,—

THE WITNESS: I don't remember.

MISS CHU: —I would again object to this line of questioning regarding defendant's assertion of his right to remain silent.

THE COURT: Overruled.

Q   What was your answer, Mr. Alo?

A   I don't remember.

Q   You mean to say, Mr. Alo, that you are accused of the crime of attempted murder and you don't recall whether you talked to any police officers after you were arrested?

A   I knew I talked to a police officer. I don't recall his name.

Q   You explained to him that you weren't the one, Mr. Alo? You didn't do that?

A   I didn't do it.

Q   But, now, at the time of trial you come in and tell us that you didn't do it.

A   I didn't do it. (Tr. at 205).

Petitioner's appeal to the Supreme Court of Hawaii was based on the ground that this cross-examination (as well as prolonged references by the prosecutor to the defendant's having signed a *Miranda* form, Tr. at 188–94) violated his Fourteenth Amendment due process rights, *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976). In *Doyle* the defendants were questioned regarding their silence after arrest. The prosecutor impeached them based on their failure to protest their innocence after being given *Miranda* warnings. In his closing statement, the prosecutor again argued the post-arrest silence to the jury. The Supreme Court in *Doyle* held that this was improper.

The warnings mandated by [*Miranda*] .   .   . require that a person taken into

custody be advised immediately that he has the right to remain silent, that anything he says may be used against him, and that he has a right to retained or appointed counsel before submitting to interrogation. Silence in the wake of these warnings may be nothing more than the arrestee's exercise of these *Miranda* rights. Thus, every post-arrest silence is insolubly ambiguous because of what the State is required to advise the person arrested. . . . Moreover, while it is true that the *Miranda* warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warnings. In such circumstances, it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial.

426 U.S. at 617–18, 96 S.Ct. at 2244–2245 (footnotes omitted).

The Supreme Court of Hawaii, by a three to two margin, rejected petitioner's contention that *Doyle* was applicable. That court held that petitioner had opened up the area of his post-arrest statements to police when he responded on direct examination: "I told him, 'Where is she? I thought she was in the apartment.' And then he told me, 'You know what happened,' and I told him, 'I don't know. I just came back from a walk.'" The Hawaii Supreme Court found that after petitioner made this statement, the prosecutor had the right to ask him about it on cross-examination. The prosecutor's question: "Mr. Alo, at the time that you talked to or Detective Springer talked to you, had you told any police officer what you told us today?", was held to be proper, and when the petitioner answered "No" (contradicting his direct testimony) and "I don't recall," he opened up the door to the prosecutor's entire line of questioning.

The initial questions had a legitimate tendency to test the memory and the veracity of the witness, and the question involving Detective Springer, in view of the defendant's answers to the preceding questions, went to the credibility issue of whether he had in fact given his exculpatory version to the police as he claimed he did. The questions asked on cross-examination were a natural and logical sequel to the defendant's testimony on direct examination. Objectively appraised, the thrust of the prosecution's examination was not calculated to penalize the defendant for his silence in the face of custodial interrogation after he had been given the *Miranda* warnings.

57 Haw. at 424, 558 P.2d at 1016.

The Hawaii Supreme Court relied heavily on *United States v. Fairchild,* 505 F.2d 1378 (5th Cir. 1975) in support of their decision. *Fairchild,* however, is a very different case than the one at bar. In *Fairchild,* defense counsel asked a government agent on cross-examination: "'During the period of time that this investigation has been going on, to your knowledge has Mr. Fairchild cooperated fully with the FBI and the U.S. Attorney's Office in responding with anything that you all wanted?'" 505 F.2d at 1383. Defense counsel tried to create the impression that his client had fully cooperated with the government. The *Fairchild* court held that in that circumstance it was proper for the government to have an agent testify that Fairchild had failed to give any statement following his *Miranda* warnings. The court held that given Fairchild's opening up the door, the government could introduce the statement "for the purpose of rebutting the impression which he attempted to create: that he cooperated fully with the law enforcement authorities." *Id.* In closing, the prosecutor again argued Fairchild's silence, but this time as direct evidence of his guilt. The court held that this was *clearly improper* and should have been excluded with a corrective instruction. The court declined to reverse, however, because defense counsel never objected to the comment and because under the circumstances the trial court's failure to expunge *sua sponte* was not plain error. The Fifth Circuit gave the distinct impression that had an objection been made and overruled, the conviction would have been overturned.

In this case, petitioner testified on direct examination that he had made some statements to the arresting officer. This is

hardly the *Fairchild* situation of intimating full cooperation. However, the State had the right to ask petitioner about his direct testimony. The prosecutor's somewhat confusing: "Mr. Alo, at the time that you talked to or Detective Springer talked to you, had you told any police officer what you told us today?", is probably permissible in this regard. After that question, a proper follow up might have been: "But you testified on direct that you did tell your story. Now which is correct?" The prosecutor also could have recalled the arresting officer to testify as to whether Mr. Alo *had* made any statements. That would have been permissible impeachment because of Mr. Alo's claim to have told his story to the arresting officer. But the prosecutor did not do this. It is clear that the prosecutor was not attempting to show the inconsistency of petitioner's direct testimony, or to rebut a claim of post-arrest, pre-*Miranda* cooperation. The prosecutor did not ask, subsequent to the first question, about petitioner's pre-*Miranda* statements to the arresting officer. He went right to the post-*Miranda* questioning—that conducted by Detective Springer, the officer who administered the *Miranda* warnings at the station house. The inference is that the prosecutor was attempting to use the silence as direct evidence of guilt.

Q You mean to say, Mr. Alo, that you are accused of the crime of attempted murder and you don't recall whether you talked to any police officers after you were arrested?

. . . . .

Q You explained to him that you weren't the one, Mr. Alo? You didn't do that?

. . . . .

Q But, now, at the time of trial you come in and tell us that you didn't do it.

Petitioner never stated that he had fully cooperated at all times. He simply mentioned a story he had told to the arresting officer. The prosecutor should have confined his questions to the area of petitioner's pre-*Miranda* statements to the arresting officer. The record supports the conclusion that the prosecutor was intimating to the jury that if petitioner truly was innocent, he would have voiced his innocence, *Miranda* warnings or not. This is impermissible.

The prosecutor, on the record, made his intentions quite clear when he was arguing to the judge that he should be allowed to bring out petitioner's silence. The following statement was in response to defense counsel's first (and timely) objection.

I'd like to—although he is telling the story he had nothing to do with this, he did not know why he was arrested, I would like at this time—point in time show, in fact, he was given his complete constitutional warnings and that statement—*he told Detective Springer nothing about the fact that he was—he had nothing to do with it.* (Tr. at 189–90) (emphasis added).

The prosecutor never even mentioned petitioner's statement on direct. He stated to the judge that he wanted to bring out petitioner's silence because that silence, after the *Miranda* warnings, was totally inconsistent with innocence. This is exactly what was forbidden in *Doyle*, and even what was decried in *Fairchild*, though in a much different procedural posture. Other cases that are similar to *Fairchild* are also distinguishable.[1] The prosecutor's cross-examination violated petitioner's constitutional rights.

At oral argument before this Court, the attorney for the State (who also prosecuted the case in Circuit Court) conceded that if there was error, it was not harmless.

---

1. The Hawaii Supreme Court cites *United States v. Griffin*, 530 F.2d 101 (5th Cir. 1976). In that case, the defendant "created the misleading impression that the prosecution had been previously informed of his defense." *Id.* at 103. In response, the prosecutor asked if the defendant had in fact told his story to anyone else. The court held that the prejudicial effect of this was minimal, especially be-

cause "the prosecutor did not develop the prejudicial picture of an accused remaining silent in the face of police interrogation at the time of arrest." *Id.* In this case, the latter is exactly what the prosecutor did. He painted a picture of a defendant who, charged with the serious crime of attempted murder, remained silent at the time of arrest. "But, now, at the time of

Nevertheless, this Court feels it must make an independent determination of whether under the standard enunciated in *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1966), the error was harmless beyond a reasonable doubt. This Court feels the error cannot be considered harmless. There was certainly sufficient evidence to convict the petitioner—Ms. Ramos' testimony plus the parafin test. Yet, the petitioner did offer an alibi which was not disproved by the State. The State offered no corroboration of Ms. Ramos' testimony in the form of other witnesses, and it offered no evidence regarding petitioner's possession of a .38. The jury had to determine who was telling the truth, Ms. Ramos or Mr. Alo, and it believed Ms. Ramos. Yet, the prosecutor's comments went to the heart of petitioner's credibility, directly linking his failure to testify with substantive evidence of his guilt. There was no admonition by the judge to disregard the questions at the time they were asked, and there was no corrective instruction. The constitutional violation cannot be considered harmless.

In *Scarborough v. Arizona,* 531 F.2d 959 (9th Cir. 1976), in his closing argument, the prosecutor made a statement to the effect that if the defendant were not guilty he would have said something when arrested. The prosecutor rejected the court's offer to cure. The 9th Circuit found that this one comment was sufficient to violate the defendant's rights, and that there was some weak evidence upon which the jury could have acquitted. It found the error was not harmless beyond a reasonable doubt. In

petitioner's case, the prosecutor's comments were even more extensive, and the prosecutor similarly suggested to the jury that petitioner's guilt could be inferred from his post-*Miranda* silence. Here there was no curative instruction, and if the jury had believed petitioner they could have acquitted.

In *Chapman v. United States,* 547 F.2d 1240 (5th Cir.), *cert. denied,* 431 U.S. 908, 97 S.Ct. 1705, 52 L.Ed.2d 393 (1977), Judge Goldberg established a standard for determining whether *Doyle* violations were harmless error. "When the prosecution uses defendant's post-arrest silence to impeach an exculpatory story offered by defendant at trial and the prosecution directly links the implausibility of the exculpatory story to the defendant's ostensibly inconsistent act of remaining silent, reversible error results even if the story is transparently frivolous." *Id.* at 1249. This Court believes that describes the situation here. "But now, at the time of trial you come in and tell us that you didn't do it." However, even if that is not the proper test, the second *Chapman* category is also applicable.

When the prosecutor does not directly tie the fact of defendant's silence to his exculpatory story, *i. e.,* when the prosecutor elicits that fact on direct examination and refrains from commenting on it or adverting to it again, and the jury is never told that such silence can be used for impeachment purposes, reversible error results if the exculpatory story is not totally implausible or the indicia of guilt not overwhelming.

trial you come in and tell us that you didn't do it."

In *United States v. Helina,* 549 F.2d 713 (9th Cir. 1977), prosecutors referred several times to the defendant's failure to turn over all his records to the government, in exercise of his Fifth Amendment rights. The court did not overturn the conviction for several reasons. In the first place, it held that no objections were made, and the exchanges did not rise to the level of plain error. Also, the court was only *arguendo* viewing the prosecutor's comments as improper. However, the court did state that the defendant's counsel had implied that defendant had fully cooperated with the government, and that even with this cooperation the government had

not documented its case. "Having thus raised the subject of the Government's documentation of its case, Helina opened the door to a full and not just a selective development of that subject." 549 F.2d at 719. Even if that statement by the court is viewed as other than *dicta,* this case is a far different one. The subject petitioner raised on direct was *not* full cooperation, but rather a single statement to the arresting officer. The State had the right to fully develop that subject, but it did not have the right to fully develop defendant's silence at all stages of the investigation. Had defendant testified on direct: "I told my story to every officer who interrogated me," the result might be different. But, he did not do so.

*Id.* Here, petitioner's story is not totally implausible, and in addition, the indicia of guilt while sufficient to support a conviction, and perhaps even strong, is not overwhelming. Other cases this Court has examined support the same conclusion—that the error in this case was not harmless.[2]

Accordingly, IT IS ORDERED that unless the State of Hawaii affords the petitioner, Fuiavailili Tapua Alo, a new trial within 120 days from the date of this DECISION AND ORDER, a writ of habeas corpus shall issue, directing the respondent to release from custody the body of petitioner.

---

**2.** In *Douglas v. Cupp*, 578 F.2d 266 (9th Cir. 1978), *cert. denied*, 439 U.S. 1081, 99 S.Ct. 865, 59 L.Ed.2d 52 (1979), at the end of the direct examination of the arresting officer, the prosecutor asked: "Did [the defendant] make any statements to you? A. No. Prosecutor: That's all the questions I have." *Id.* at 267. The court stated that though this was a single reference, the placement at the end of the questioning gave it a prominence it otherwise might not have had. The court found the other evidence equivocal, and determined the error was not harmless. In this case, there were many references, not just a single question, and while equivocal is perhaps too strong a term, the evidence of guilt was not overwhelming.

Many other cases have found *Doyle* violations that are similar to or less egregious than the ones in this case not to have been harmless error. *See, e. g., United States ex. rel. Allen v. Rowe*, 591 F.2d 391 (7th Cir. 1979); *United States v. Meneses-Davila*, 580 F.2d 888 (5th Cir. 1978); *United States v. Edwards*, 576 F.2d 1152 (5th Cir. 1978); *Morgan v. Hall*, 569 F.2d 1161 (1st Cir.), *cert. denied*, 437 U.S. 910, 98 S.Ct. 3103, 57 L.Ed.2d 1142 (1978); *United States v. Johnson*, 558 F.2d 1225, (5th Cir. 1977); *Reid v. Riddle*, 550 F.2d 1003 (4th Cir. 1977); *United States v. Luna*, 539 F.2d 417 (5th Cir. 1976); *Minor v. Black*, 527 F.2d 1 (6th Cir. 1975), *cert. denied*, 427 U.S. 904, 96 S.Ct. 3189, 49 L.Ed.2d 1198 (1976).