**Electronically Filed
Intermediate Court of Appeals
CAAP-19-0000680
25-MAR-2021
07:46 AM
Dkt. 42 MO**

NO. CAAP-19-0000680

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAIʻI


STATE OF HAWAIʻI, Plaintiff-Appellee, v.
ANTHONY K. PADA, also known as Anthony Keoni Pada,
Defendant-Appellant

APPEAL FROM THE DISTRICT COURT OF THE FIRST CIRCUIT
WAIʻANAE DIVISION
(CASE NO. 1DTA-19-02262)


MEMORANDUM OPINION
(By: Ginoza, C.J., and Hiraoka and Wadsworth, JJ.)

Defendant-Appellant Anthony K. Pada, also known as
Anthony Keoni Pada (**Pada**), appeals from the Notice of Entry of
Judgment and/or Order and Plea/Judgment (**Judgment**), entered on
September 16, 2019, in the District Court of the First Circuit,
Waiʻanae Division (**district court**).[1]  After a bench trial, the
district court convicted Pada of operating a vehicle under the
influence of an intoxicant (**OVUII**), in violation of Hawaii
Revised Statutes (**HRS**) § 291E-61(a)(1) (Supp. 2019),[2] and
sentenced him for a first offense pursuant to HRS § 291E-
61(b)(1).

---

[1]    The Honorable William M. Domingo presided.

[2]    HRS § 291E-61(a)(1) states, in relevant part:

    (a)  A person commits the offense of operating a
vehicle under the influence of an intoxicant if the person
operates or assumes actual physical control of a vehicle:

    (1)    While under the influence of alcohol in an
           amount sufficient to impair the person's normal
           mental faculties or ability to care for the
           person and guard against casualty[.]

On appeal, Pada contends that Plaintiff-Appellee State of Hawaiʻi (**State**) violated his right to remain silent under article I, section 10 of the Hawaiʻi Constitution by commenting during trial "that Pada never told [the arresting officer] that his medication or injuries affected his ability to perform the [Standardized Field Sobriety Test (**SFST**)]." Pada asserts this violation of his constitutional rights was not harmless beyond a reasonable doubt.

We vacate the Judgment and remand for a new trial, for the reasons set forth below.

## I. Background

At trial, Kekoa Gaspar-Silva (**Gaspar-Silva**) testified as follows: On June 21, 2019, at about 5:00 a.m., Gaspar-Silva was in his house on Kauiki Street in Honolulu when he heard a loud sound. He walked outside and saw that his car, which was parked across the street from his house, had been hit; "the fender was smashed." Gaspar-Silva also saw that Pada's truck "was down a little bit by [Gaspar-Silva's] neighbor's house." Pada asked Gaspar-Silva if the damaged car was his, and Gaspar-Silva said yes. The two men "made sure [they] both had insurance." Gaspar-Silva called the police while Pada waited by his truck. Gaspar-Silva had no trouble understanding Pada as they spoke.

Honolulu Police Department (**HPD**) Officer Nicholas Griffin (**Officer Griffin**) next testified to the following: He arrived on the scene at 5:13 a.m. and observed a white pickup truck "with the front driver's side tire missing." He observed Pada "going through the . . . driver's side of the vehicle" as he was "looking for the information for his vehicle." Officer Griffin asked Pada if the vehicle belonged to him. Pada responded, yes, it did, and also informed Officer Griffin that he (Pada) had hit Gaspar-Silva's vehicle. While Officer Griffin was speaking with Pada, Officer Griffin "detected . . . a strong smell of alcohol coming from [Pada's] breath . . . ." He asked Pada for his license, registration, and insurance card and did not recall Pada having any trouble providing that information.

2

Officer Griffin spoke to Pada over the course of half an hour but did not recall that Pada had red, watery eyes or that he (Officer Griffin) had any trouble understanding Pada. Officer Griffin did not note that Pada was "slurring his words."

HPD Officer Torey Seminara (**Officer Seminara**) next testified as follows: He arrived on the scene, was apprised of the facts and circumstances by Officer Griffin, and then spoke to Pada. In response to Officer Seminara's questions, Pada said he had come from home, which was "two blocks up the street," and had been looking for parking in the neighborhood. Pada had "no issue" answering questions and "wasn't slurring." Officer Seminara detected a "strong odor" of "what [he] believed to be an alcohol-type beverage" on Pada's breath, but also thought it possible that "it could have been a different substance[.]" He observed that Pada's "eyes were red, watery, glassy, bloodshot." Officer Seminara asked Pada if he would participate in an SFST, and Pada agreed.

Prior to administering the SFST, Officer Seminara asked Pada "medical rule-out questions . . . to allow the possibility of any medical circumstances preventing [Pada] from doing the [SFST] or possibly interfering with the [SFST]."[3] Pada responded that he had "a past injury" and received "back surgery for slipped disks" in 2003 and again in 2008, that he was taking medications (ibuprofen and tizanidine), and that he was "prediabetic." Officer Seminara then "made the determination that [Pada] was fit to do the [SFST]" and proceeded to administer the tests.

Officer Seminara testified that, at one point during the horizontal gaze nystagmus test, Pada "stopped following the stimulus, and he stared straight ahead for a few seconds," contrary to instructions. During the walk and turn test, Pada was "unable to stay in the . . . position of instruction" as he could "only balance there for a few seconds" and then "went back to standing normally." As Pada walked, he missed several heel to toe steps and stepped off the line several times. During the

_____

[3] Pada does not raise any challenge to the medical rule-out questions.

one-leg stand test, Pada was unable to hold his foot six inches above the ground or keep his eyes on the tip of his toe for the duration of the test, but he did not sway, hop, or use his arms, and he had no issue following instructions or counting aloud. Thereafter, Officer Seminara told Pada, "there's an indication that you might be impaired," to which Pada allegedly responded "yes, I am."  Officer Seminara's police report did **not** note that Pada had said he was impaired.

On cross-examination, defense counsel asked Officer Seminara:  if he was "aware that diabetes can cause a symptom known as ketoacidosis, which can cause odor of alcohol[,]" to which Officer Seminara responded, "I wasn't aware of that"; if Pada had told Officer Seminara that he (Pada) had had prior back surgeries and was taking medication, to which Officer Seminara responded "yes"; if Officer Seminara knew that one of the medications, tizanidine, was a muscle relaxer, to which Officer Seminara responded "no"; and if not knowing the effects that a muscle relaxer could have on the SFST would "compromise the test," to which Officer Seminara responded "I don't believe so."

During the State's redirect examination, the following exchange occurred:

> [By Deputy Prosecuting Attorney (**DPA**)] Q.  And when [Pada] talked about his slipped disk, did he -- did he tell you or complain of any pain or injuries when you asked him?
>
> [By Officer Seminara] A.  No, at no time.
>
> . . . .
>
> Q.   Okay.  And after the defendant explained that he took in these medications and that he was prediabetic and had a slipped disk, why did you continue with the [SFST]?
>
> A.   I continued with it because he didn't complain of any pain, and he didn't make any statements of saying why he was unable to do the test.  I didn't observe any physical injuries.  So I felt like -- I made the determination that he was fit to do the [SFST].

After the State rested, the defense called Pada, who testified to the following:  At 5:00 a.m. on June 21, 2019, Pada, who lives on Kauiki Street, was just waking up to move his truck, which was parked in front of his neighbor's driveway.  He gets up at five in the morning "maybe three times a week" to move his truck.  On the morning at issue, Pada was looking for a parking

4

spot on his street, when a cat ran in front of his truck. Pada swerved to avoid the cat and hit the fender of Gaspar-Silva's parked car. Pada quickly turned in the other direction, but his tire caught on Gaspar-Silva's fender, pulling the tire off Pada's vehicle. The accident occurred probably fifteen minutes after Pada woke up, after about five hours of sleep. Pada got out of his truck and went to check if anyone was in the parked car he had hit. As neighbors came out of their houses, Pada "asked someone to call the police."

Regarding his medical conditions and medications, Pada testified that: he is "prediabetic"; he re-injured a slipped disk in December 2018; he takes ibuprofen and tizanidine, a muscle relaxer, for the slipped disk; tizanidine can "make you a little groggy" and he takes it daily at about midnight prior to bed; he often feels "groggy" when he wakes up at 5 a.m.; he has an eye condition called "pterygium" that causes a red growth on the white of his eye; the muscle relaxer he takes could cause him to be off balance if standing on one foot; and his back injuries make standing for a long period of time or in an uncomfortable position difficult for him. Pada further testified that he told Officer Seminara that he was under a doctor's care; he did not recall telling Officer Seminara he was impaired; and he drank no alcohol on the morning of, or the night before, the incident on June 21, 2019.

The State then cross-examined Pada in the following exchange:

> BY [DPA]:
>
> Q. So, Mr. Pada, did you at any time tell Officer Seminara that you felt uncomfortable or imbalanced during the SFST?
>
> A. No, I didn't tell him that.
>
> Q. And why?
>
> A. Because I'm (indiscernible) used to that. It's not something that I would think that I would have to let him know.
>
> Q. But didn't he ask you if you had any questions?
>
> A. Yeah, pertaining to the -- the test that he was giving me, which I completely understood what he was telling me.

Q.   So couldn't you have asked him that question, if you had medication, if you were unable to perform the SFST?

A.   He did ask me if I had any medication, and I thought that if he felt that would impair me in any way, he wouldn't administer it.

.   .   .   .

Q.   (BY [DPA]) If you felt that way about being uncomfortable about asking the question, wouldn't you have asked Officer Seminara if you did really feel that way?

A.   (Indiscernible) I really felt that way.  I just wanted to comply with whatever the officer was telling me to do.

During its closing argument, the State argued in part:

And in conducting the [SFST], [Officer Seminara] asked the defendant medical rule-out questions.  He did note that the defendant was under medication, but the defendant didn't say when he was under these medications.  And although he noted that he did have a slipped disk, he didn't say anything.

There's a question, do you have any physical defects or impediments?  The defendant said no.  At any point of the [SFST], if he felt uncomfortable or because of the medication, he could have asked the officer.

Officer Seminara testified that he asked questions. He -- he gave instructions to the defendant.  The defendant understood any questions.  He didn't have any -- anything to say during the [SFST].

After closing arguments, the district court summarized the testimony elicited at trial, including the following:

Prior to giving the test, [Officer Seminara] asked Mr. Pada the medical rule-out questions.  At which point, Mr. Pada stated that he had back surgery for a slipped disk and was on ibuprofen, and later on, verified by cross-examination and also the testimony of Mr. Pada, that it was also a muscle relaxant that he had taken. . . .

.   .   .   .

Officer Seminara did not follow up on the questions as far as the medication.  Mr. Pada did not tell him any further about when these -- wait, hang on.  On cross-examination, Officer Seminara stated that the prior back surgery was in 2003 and also 2008.

In going forward with the test, Officer Seminara testified that he didn't see any reason to discontinue the test, as he felt the defendant was able to participate and nothing was going to affect the performance . . . because of any medical situation.

The district court found Pada guilty of the OVUII charge.  This appeal followed.

6

## II. Discussion

"[T]he right to remain silent under article I, section 10 of the Hawaiʻi Constitution attaches at least at the point at which a person has been seized." State v. Tsujimura, 140 Hawaiʻi 299, 319, 400 P.3d 500, 520 (2017).

> A person is seized if, given the totality of the circumstances, a reasonable person would have believed that he or she was not free to leave. Whether a reasonable person would feel free to leave is determined under an objective standard that this court reviews de novo. A person is seized for purposes of article I, section 7 of the Hawaiʻi Constitution, when a police officer approaches that person for the express or implied purpose of investigating him or her for possible criminal violations and begins to ask for information.

State v. Weldon, 144 Hawaiʻi 522, 531-32, 445 P.3d 103, 112-13 (2019) (quoting State v. Tominiko, 126 Hawaiʻi 68, 77, 266 P.3d 1122, 1131 (2011)); see State v. Kearns, 75 Haw. 558, 566, 867 P.2d 903, 907 (1994).

Here, Pada was seized at least when Officer Seminara asked him to participate in the SFST, because the purpose of the request was to determine whether Pada drove his vehicle while impaired, and given the totality of the circumstances, a reasonable person in Pada's position would not have felt free to ignore Officer Seminara's inquiries and walk away. Thus, Pada's right to remain silent attached at least when he was asked to participate in the SFST.

To determine whether the State elicited evidence at trial in violation of Pada's right to remain silent, we apply the following test:

> [W]here the prosecution elicits from a witness information regarding the defendant's prearrest silence, the test is whether the prosecutor intended for the information elicited to imply the defendant's guilt or whether the character of the information suggests to the factfinder that the defendant's prearrest silence may be considered as inferential evidence of the defendant's guilt.

Tsujimura, 140 Hawaiʻi at 315, 400 P.3d at 516 (clarifying the test applied in State v. Rodrigues, 113 Hawaiʻi 41, 49-50, 147 P.3d 825, 833-34 (2006) (**the Rodrigues test**)).

In Tsujimura, the Hawaiʻi Supreme Court held that the defendant's prearrest silence while detained during an investigatory stop was introduced into evidence as substantive

7

proof of his guilt, in violation of his right to remain silent. Id. at 318, 400 P.3d at 519. There, the arresting officer testified that the defendant agreed to take an SFST and, in response to the medical rule-out questions, stated that "he had an old injury to his left knee . . . and that he was taking medication for his high blood pressure and diabetes." Id. at 303, 400 P.3d at 504. On redirect examination, the prosecutor asked the officer whether the defendant mentioned while exiting the car that he could not get out due to his injury. Id. at 304-05, 400 P.3d at 505-06. The defendant objected as "the question sought and elicited a response that commented on Tsujimura's right to remain silent." Id. at 305, 400 P.3d at 506. The supreme court applied the Rodrigues test and held that the purpose of the question was to imply guilt. Id. at 316, 400 P.3d at 517. The court "emphasize[d] that the silence used against [the defendant] was not made in response to a question posed by [the arresting officer]," id. at 313, 400 P.3d at 514, and then explained:

> By eliciting the fact that [the defendant] did not say anything about his injury while he exited his car, it was clear that the State's purpose was to imply that [the defendant's] injuries did not physically inhibit him from performing the [S]FSTs and to inferentially establish that [the defendant's] diminished faculties during the [S]FSTs were a product of intoxication and not influenced by his injuries.

Id. at 316, 400 P.3d at 517. "[T]he character of the evidence" also led "to the conclusion that its admission at trial was improper" because it suggested that the defendant's "silence implied that his physical condition while performing the [S]FSTs was due to alcohol impairment[.]" Id.

Here, Pada argues that the State's questions to Officer Seminara on redirect and to Pada on cross-examination, as quoted above, and the State's related comments in closing, "were clearly designed to imply that because Pada had not told Officer Seminara that his back issues or medication would affect his performance on the SFST, that Pada's performance on the SFST was solely due to intoxication." The State counters that, unlike the circumstances in Tsujimura, the State's redirect examination of Officer Seminara concerned Pada's answers given in response to

8

questions posed by the officer; similarly, the State's cross-examination of Pada concerned answers given in response to Officer Seminara's questions that were directed at determining whether he could administer the SFST.  The State further argues that when considered in conjunction with defense counsel's examinations, the State's examinations were not intended to imply Pada's guilt; nor does the character of the elicited information suggest to the fact-finder an inference of guilt.

The record does not support the State's arguments with regard to its cross-examination of Pada.  Specifically, the questions posed by the State did not concern Pada's answers given in response to questions by Officer Seminara that were directed at determining whether he could administer the SFST.  According to Officer Seminara, once he concluded the medical rule-out questions, he "made the determination that [Pada] was fit to do the [SFST]," and proceeded to administer the tests.  The record does not show that Officer Seminara asked Pada any further questions about his medical conditions, medications, comfort, pain, or his ability to perform the SFST once it was commenced.  However, in the following excerpt from Pada's cross-examination, the State repeatedly questioned why Pada did not inform the officer at any point **during the SFST** that he was uncomfortable or ask whether his medication would impair his performance on the SFST:

BY [DPA]:

Q.    So, Mr. Pada, *did you at any time tell Officer Seminara that you felt uncomfortable or imbalanced during the SFST?*

A.    *No, I didn't tell him that.*

Q.    *And why?*

A.    Because I'm (indiscernible) used to that.  It's not something that I would think that I would have to let him know.

Q.    But didn't he ask you if you had any questions?

A.    Yeah, pertaining to the -- the test that he was giving me, which I completely understood what he was telling me.

Q.    *So couldn't you have asked him that question, if you had medication, if you were unable to perform the SFST?*

A.    He did ask me if I had any medication, and I thought that if he felt that would impair me in any way, he wouldn't administer it.

. . . .

Q.    (BY [DPA]) *If you felt that way about being uncomfortable about asking the question, wouldn't you have asked Officer Seminara if you did really feel that way?*

A.    (Indiscernible) I really felt that way.  I just wanted to comply with whatever the officer was telling me to do.

(Emphases added.)

The State's line of questioning here appears to imply that Pada should have spoken up *spontaneously* while performing the SFST, or in response to earlier questions concerning whether he **understood the SFST instructions**, to let the officer know that he (Pada) was physically uncomfortable during the test or to ask if his medication would impair his performance.  The State similarly argued during closing that "***[a]t any point*** of the [SFST], if [Pada] felt uncomfortable or because of the medication, **he could have asked** the officer. . . .  **He didn't have . . . anything to say during the [SFST]**." (Emphases added.)

Because Officer Seminara had already concluded the medical rule-out questions and had moved on to the tests themselves, the State's cross-examination of Pada about his silence during the SFST raises the very concerns identified by the supreme court in <u>Tsujimura</u>.  140 Hawaiʻi at 313, 400 P.3d at 514.  There, the court noted that during trial, "the prosecutor was asking what [the defendant] failed to say even if the information was <u>not</u> prompted or sought from him by [the arresting officer]." <u>Id.</u>  The court reasoned that in such circumstances:

> [P]ermitting silence to serve as an implication of guilt would mean that the State would always be able to use as substantive proof of guilt prearrest silence not made in response to a question by a police officer. *The prosecutor need only identify a point in time during the defendant's interaction with the police officer when no question was posed and no verbal exchange was had (and, therefore, the defendant was expectedly silent) and use that silence as evidence to infer the defendant's guilt*.  This would engender a result where, in any encounter between a law enforcement officer and a citizen, the State would be able to adduce evidence of prearrest silence in myriad ways (e.g., When she was handing you her driver's license and registration, did she say anything about her injuries?, While she was opening the glove box, did she say anything about her injuries?, While she was outside the car, did she say anything?, etc.).

10

Id. at 313-14, 400 P.3d at 514-15 (emphasis added).

The same reasoning applies here. Once Pada responded that he had no questions about the SFST instructions, Officer Seminara's question was answered, and no additional response was expected. Cross-examining Pada at trial as to why he did not inform the officer at any point during the SFST that he was uncomfortable or ask whether his medication would impair his performance on the SFST clearly implicated Pada's right to remain silent under Tsujimura.

Moreover, the State's cross-examination of Pada does not appear to be directed at determining whether Officer Seminara could administer the SFST, as the State argues, but rather, to imply or infer Pada's guilt. Indeed, the State argues that it sought to **"*expose[] fairly the inconsistency* between [Pada's] representations to Officer Seminara that he had no physical defects or impediments and his trial testimony in which he attributed his poor performance on the field sobriety test to his physical condition and the effects of the medications related thereto."** (Emphasis added.) Thus, the State's intent was not to establish that Officer Seminara could administer the test, but to point out Pada's allegedly inconsistent statements about his ability to perform the SFST.

Additionally, when considered in conjunction with Pada's direct examination, the State's line of questioning on cross-examination further supports Pada's argument that the questioning was intended to imply his guilt or suggest to the fact finder that it may infer guilt. On direct examination, defense counsel elicited Pada's testimony concerning his medical conditions and medications as they potentially related to his performance on the SFST, and generally not concerning what Pada *told Officer Seminara* about his medical conditions and medications.[4] In contrast, the State's cross-examination did not

---

[4] Pada's only testimony on direct examination as to what he told Officer Seminara about his medical conditions was the following:

> Q.  . . . Officer Seminara asked you . . . if you were under the care of a doctor for anything?
>
> A.  Correct.

11

directly challenge Pada's testimony concerning whether his medical conditions affected his performance on the SFST, but focused on what Pada **did not tell the officer** about his conditions. This suggests that the purpose of the questioning was indeed to imply or infer Pada's guilt. See Tsujimura, 140 Hawaiʻi at 316, 400 P.3d at 517 (by eliciting that the defendant did not say anything about his injury while exiting his car, the State's purpose was to imply that his injuries did not physically inhibit him from performing the SFST and to inferentially establish his guilt).

Accordingly, on this record, we conclude that the State violated Pada's right to remain silent, by eliciting during cross-examination that he did not say he was uncomfortable during the SFST or ask whether his medication would impair his performance, and by commenting on this information during the State's closing argument.

The District Court, however, admitted this testimony and allowed this closing argument without any objection from the defense based on Pada's right to remain silent. We therefore review this issue for plain error. See Hawaiʻi Rules of Penal Procedure Rule 52(b). The supreme court has summarized the plain error standard as follows:

> It is "firmly established" that the relevant inquiry when evaluating whether a trial court's plain error may be noticed is whether the error affected substantial rights. Thus, a reviewing court has discretion to correct plain error **when the error is "not harmless beyond a reasonable doubt**."
>
> . . . .
>
> . . . If there is **a reasonable possibility that the error contributed to the conviction**, "the error is **not harmless beyond a reasonable doubt**, and the conviction must be set aside."

State v. Ui, 142 Hawaiʻi 287, 297, 418 P.3d 628, 638 (2018) (citations & footnotes omitted; emphases added).

On this record, it appears that the district court may have relied in part on Pada's exercise of his right to remain

---

Q. And what did you respond to that?

A. That I am.

12

silent in finding him guilty of OVUII.  In rendering its decision, the district court noted, for example, the following:

> Officer Seminara did not follow up on the questions as far as the medication.  ***Mr. Pada did not tell him any further about when these -- wait, hang on.  On cross-examination, Officer Seminara stated that the prior back surgery was in 2003 and also 2008.***

Thus, it is possible that the district court may have inferred from the fact that Pada did not provide further details about his current medical condition and medication that these factors did not physically inhibit him from performing the SFST and that Pada's purportedly poor performance was a product of intoxication and not influenced by his injuries.  See Tsujimura, 140 Hawaiʻi at 316, 400 P.3d at 517; State v. Jones, 148 Hawaiʻi 152, 170-71, 468 P.3d 166, 184-85 (2020).

In addition, based on our review of the trial record, including the evidence countervailing a finding of intoxication, we cannot conclude there is no reasonable possibility that the district court's error contributed to Pada's conviction.  See Tsujimura, 140 Hawaiʻi at 318, 400 P.3d at 519 (noting the presence of "evidence countervailing a finding of intoxication" in concluding that erroneously admitted testimony was not harmless beyond a reasonable doubt); see also State v. Torres, 144 Hawaiʻi 282, 291, 439 P.3d 234, 243 (2019) ("When assessing whether the error was harmless, 'a crucial if not determinative consideration is the strength of the prosecution's case on the defendant's guilt.'" (quoting State v. Tetu, 139 Hawaiʻi 207, 226, 386 P.3d 844, 863 (2016)) (brackets and ellipsis omitted)).  The district court's error thus was not harmless beyond a reasonable doubt.

In choosing to invoke our discretionary review of plain error, we may also consider whether the record evinces "errors which seriously affect the fairness, integrity, or public reputation of judicial proceedings."  Ui, 142 Hawaiʻi at 298, 418 P.3d at 639 (quoting State v. Miller, 122 Hawaiʻi 92, 100, 223 P.3d 157, 165 (2010)).  "We will correct such errors 'to prevent the denial of fundamental rights' — regardless of whether the error was brought to the attention of the trial judge or raised on appeal."  Id. (quoting Miller, 122 Hawaiʻi at 100, 223 P.3d at

165).  Here, the district court's error affected Pada's right to remain silent, which is a fundamental constitutional right.  See State v. Mainaaupo, 117 Hawaiʻi 235, 252, 178 P.3d 1, 18 (2008) ("There is nothing more basic and more fundamental than that the accused has a constitutional right to remain silent, and the exercise of this privilege may not be used against him." (quoting State v. Alo, 57 Haw. 418, 424, 558 P.2d 1012, 1016 (1976))).

Accordingly, we conclude that the district court's error affected substantial rights and Pada's conviction must be set aside.

### III. Conclusion

For the reasons discussed above, we vacate the Judgment entered on September 16, 2019, in the District Court of the First Circuit, Waiʻanae Division, and remand this case to the district court for further proceedings consistent with this Memorandum Opinion.

DATED:  Honolulu, Hawaiʻi, March 25, 2021.

On the briefs:

Jon N. Ikenaga,
Deputy Public Defender,
for Defendant-Appellant.

Donn Fudo,
Deputy Prosecuting Attorney,
City & County of Honolulu,
for Plaintiff-Appellee.

/s/ Lisa M. Ginoza
Chief Judge


/s/ Keith K. Hiraoka
Associate Judge


/s/ Clyde J. Wadsworth
Associate Judge

14