147 P.3d 825

**STATE of Hawai'i, Plaintiff–Appellee,**

**v.**

**Ralph J. RODRIGUES, Defendant– Appellant.**

**No. 26679.**

Supreme Court of Hawai'i.

Nov. 29, 2006.

---

Artemio C. Baxa, Deputy Prosecuting Attorney, on the briefs, for the plaintiff-appellee State of Hawai'i.

Matthew S. Kohm, Wailuku, on the briefs, for the defendant-appellant Ralph J. Rodrigues.

MOON, C.J., LEVINSON, NAKAYAMA, and DUFFY, JJ.; and ACOBA, J. concurring separately.

Opinion of the Court by LEVINSON, J.

The defendant-appellant Ralph J. Rodrigues appeals from the June 15, 2004 judgment of the circuit court of the second circuit, the Honorable Shackley F. Raffetto presiding, convicting him of theft in the second degree, in violation of Hawai'i Revised Statutes (HRS) § 708-831(1)(b) (Supp.1998).[1] On appeal, Rodrigues asserts a single point of error, to wit, that, during its case-in-chief, the prosecution improperly commented on his alleged assertion of his right to remain silent by eliciting the fact that Rodrigues declined to allow his voluntary statement to police to be audiotaped. For the reasons discussed *infra* in section III, Rodrigues's arguments are unavailing. Accordingly, this court affirms the circuit court's judgment of conviction.

## I. BACKGROUND

In July 2001, Rodrigues was working as a field welder for Hawaiian Commercial & Sugar Company (HC & S) on Maui. On July 31, 2001, an HC & S work crew informed Gerard Cambra, the head of HC & S's welding shop, that a portable arc welder with a purple cover mounted on a trailer was missing from where it had been secured the previous evening. It was the only purple welder HC & S owned and the trailer was distinctive in that it was constructed of more expensive stainless steel and was fitted with aluminum "mag" wheels. The incident was

---

1. HRS § 708-831(1)(b) provides: "(1) A person commits the offense of theft in the second degree if the person commits theft: ... (b) Of property or services the value of which exceeds $300[.]" Effective July 1, 2005 and July 1, 2006, the legislature amended HRS § 708-831 in respects immaterial to the present appeal. *See* 2006 Haw. Sess. L. Act 156, §§ 6 and 9 at 450; 2005 Haw. Sess. L. Act 182, §§ 3 and 7 at 579-80.

reported to HC & S security, and the welder was later reported as stolen.

In October 2001, Rodrigues called Benjamin Santiago, an acquaintance at HC & S who worked as the electrical supervisor in the power generation station, to arrange to bring to Santiago's shop what he asserted was his personal welding machine in the hopes it could be repaired. Rodrigues dropped the machine off on October 23, 2001, whereupon HC & S employees noticed that it resembled the missing welder and alerted Robert Motooka, HC & S's administrator of safety and risk management. Motooka cross-referenced the unit and engine serial numbers on the machine with those in company invoices for the stolen machine and confirmed that they matched.[2] The Maui Police Department (MPD) was contacted on October 25, 2001. Officer John Sang photographed the welder extensively and then proceeded to Rodrigues's home to investigate further, where he located the purple cover of the welder in Rodrigues's garage.

On October 26, 2001, Rodrigues attended a meeting at HC & S with Motooka to explore how Rodrigues came into possession of the welder. Rodrigues gave Motooka a statement similar in detail to the one he later supplied to the police, see infra this section, except that he told Motooka that he had given the trailer that accompanied the welder to an acquaintance named Rey.[3]

Ian Miyagawa, an acquaintance of Rodrigues's, later testified at trial that, during the summer of 2001, Rodrigues had brought a "brownish" arc welder, unmounted, on a stainless steel trailer to Miyagawa's home to assist in modifying a boat trailer. Miyagawa identified the welder as the one later determined to be owned by HC & S, see supra note 2. Miyagawa testified that Rodrigues kept the trailer at Miyagawa's home for at least two weeks; Rodrigues initially represented that the trailer was on loan, but eventually stated that he wanted to sell it for $1500.00. Rodrigues ultimately sold the trailer for $150.00 to Rey, who lived on Miyagawa's street.

On December 19, 2001, MPD Detective Donald Kanemitsu spoke with Rodrigues in a police interrogation room. Detective Kanemitsu later testified that Rodrigues was "cooperative" and "freely providing information." He advised Rodrigues regarding his rights to remain silent and to an attorney, as set forth in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and Rodrigues reviewed and signed a standard warning and waiver form.[4]

Detective Kanemitsu testified that Rodrigues stated during the interview that he and a friend, Shawn Kanhai, had gone to a local store to buy lunch and that Rodrigues had observed a flyer advertising a used welder for sale for $1500.00.[5] Rodrigues told Detective Kanemitsu that he had called the number on the flyer on his cell phone and had spoken with a man identifying himself as Tony. Rodrigues said that he and Tony had arranged to meet and that Rodrigues had bargained the price down to $1200.00 due to the condition of the trailer upon which the welder was mounted. Rodrigues then told Detective Kanemitsu that he had taken the trailer—which he maintained was not composed of stainless steel—back to his shop at HC & S, where he removed the welder from the trailer, salvaged many of the trailer's

---

2. Both parties stipulated to the stolen arc welder's unit and engine numbers, as well as to the facts that the purchase price of the welder was $2700.00 and that the replacement cost was $2865.33. In addition to Motooka's testimony, Maui Police Department Officer John Sang took photographs of the machine brought in by Rodrigues, which were entered into evidence and bear unit and engine numbers identical to those of the welder reported stolen.

3. Though referred to frequently in testimony by Rodrigues, Ian Miyagawa, see infra this section, and others, there is no reference in the record to Rey's full name.

4. The full chronology of the waiver process is discussed infra in this section in the context of the voluntariness hearing conducted by the circuit court with regards to Rodrigues's statements to Motooka and Detective Kanemitsu.

5. When later asked to confirm Rodrigues's version of events, Kanhai testified that he had no recollection of Rodrigues noticing a flyer pertaining to a welder and that he did not recall Rodrigues making any telephone calls concerning it.

parts, including the spindles,[6] and discarded the rest in a dumpster. Detective Kanemitsu testified that Rodrigues could not provide Tony's telephone number,[7] but that Rodrigues described the man as a Filipino male, five foot seven inches tall, weighing 170 pounds, with shoulder length hair, and driving an older Toyota pickup truck.[8] Rodrigues told the detective that he retained the spindles from the trailer because an acquaintance, Rey, had expressed an interest in buying them. Further investigation led Detective Kanemitsu to Rey, who was in possession of the stainless steel trailer later identified by Cambra as the stolen HC & S trailer, see *infra* this section.

After Rodrigues completed his statement to Detective Kanemitsu—during which time the detective took notes—Detective Kanemitsu asked Rodrigues whether he would repeat the statement for him on tape. Rodrigues declined. On January 29, 2002, Detective Kanemitsu again met with Rodrigues, who elected at that time to retain a lawyer and to make no further statements to police.

On February 1, 2002, Cambra was invited to the Wailuku Police Station, where, on behalf of HC & S, he identified and reclaimed the stainless steel trailer taken from Rey's house.

On December 23, 2002, a grand jury indicted Rodrigues on the charge of theft in the second degree, in violation of HRS § 708–831(1)(b), see *supra* note 1.

Prior to trial, the circuit court conducted a voluntariness hearing with regard to Rodrigues's statements made to Motooka and Detective Kanemitsu. Detective Kanemitsu testified that he had used a standard warning and waiver form and had confirmed that Rodrigues understood English. Rodrigues had read along while Detective Kanemitsu read the form aloud. Detective Kanemitsu asked Rodrigues to initial after each line to indicate that he understood, and Rodrigues had done so. Rodrigues then affixed his signature to the document. Detective Kanematsu reviewed the "waiver of rights" section of the document, and Rodrigues initialed each line and signed and dated it. Rodrigues did not request an attorney, and it was uncontested that Detective Kanemitsu did not threaten or coerce him.

On cross-examination, Rodrigues's counsel questioned Detective Kanemitsu extensively concerning the procedures employed in the recordation of Rodrigues's statement, including the fact that Rodrigues had declined to allow a tape recording:

Q: ... Detective, you indicated this was not recorded?

A: No, it was not.

Q: And you indicated that it was kind of like ... by asking if it was okay if I record it, is that a guess?

A: As standard procedure for myself, when I speak to any suspects, or defendants, or responsibles, I discuss with them first. And then ask them, "I'm going to tape-record this thing. Do you have any objections—whatever?" He did not wish to be recorded at the time.

Q: That's your recollection?

A: Yes, it is.

Q: Okay. You indicated that you made notes. Where are those notes today?

A: Honestly, I don't have them, they're from 2001.

Q: Your report that you filed in this case was February, I believe, of 2002?

A: If that's what it indicates.

Q: ... That's the date of the report where you signed, and at the end where there was a long list of people in the report that you had interviewed.

---

6. According to Detective Kanemitsu's understanding, a spindle is a component of a trailer wheel.

7. On cross-examination, Rodrigues confirmed that the call was made on his cell phone and that Verizon was the carrier, but he did not attempt to introduce any call records from that period to

bolster his testimony, a fact the prosecution noted in its closing arguments.

8. In his statement to Motooka, Rodrigues said that Tony had told him he used to work at an HC & S mill in P'ia. Rodrigues, however, never asked Motooka for assistance in reviewing HC & S's employment records to better identify Tony.

On the date of the report, is that when you transposed the notes—

A: To my official document, no. When I conduct my investigations, as I'm going along talking to witnesses, I write my notes. Actually, I type out my report as I'm going along during my investigation.

Q: You say you type your report as you're going along?

A: Yeah.

. . . .

Q: And there is a particular file for this case investigation, is that correct?

A: I believe so, yes.

Q: So you usually do it on the day that you—

A: Yes, I do.

Q: —do the interview? You ever do it sometime other than the day of the interview?

. . . .

A: Not usually with interviews. I'm not sure I ever have. I would be lying right now if I say I never have, but I'm saying I don't usually do it.

Q: So it could be a possibility that it could have been the following day?

A: Yeah, I guess so.

Q: Okay. And what is your standard procedure for keeping notes?

A: Can you clarify that?

Q: Okay. You take notes, you type a report from these notes?

A: Yes.

Q: Okay. Is there any reason why you do not retain the notes?

A: I usually do, but this is a 2001 case. I transfer sections and I don't recall if I have them.

Q: But could it be on file?

A: Not in the file.

Q: You say you don't recall if you have them?

. . . .

A: Notes are taken on note pads during investigations or interviews . . . . I'm saying that I don't know if I have them with me still.

Q: Where would you keep the note pad?

A: Any document, police related, is usually discarded properly if they're not needed anymore. So that's probably what happened to it.

Q: Okay. And you assume that they're not needed if you transpose the notes in the report?

A: My official report was conducted.

Q: And have you ever had an occasion where your report does not accurately reflect what's in the notes?

A: No, I have not.

Q: Is that the—have the notes ever been made available with the report to defense lawyers?

A: I never had the need to.

Q: When you say you never had the need to, have you ever been requested for your notes in the past?

A: No, I have not.

Q: Never?

A: No.

Q: How many times have you testified in a criminal case?

A: I've been on the job for over fourteen years, I can't tell you how often I've been in court.

Q: So out all of those fourteen years—I mean as often as you've been in, defense lawyers have never asked for handwritten notes?

A: No, they have not.

Q: If those notes still existed, where would they exist?

A: Like I said, they'd be properly destroyed—that's what I believe ha[s] happened to them. I don't take—I transferred sections—I don't take paperwork that I don't need to take with me to another section. So when I don't need stuff, I discard them properly.

Q: Is there generally a policy in the police department to destroy all handwritten notes after they're transposed into a report?

A: I'm not aware.

**46**

Q: And how soon after you made the report would these notes be destroyed?

A: I couldn't say, like I said, I transferred sections. Usually, when you clear out your area, that's when you discard things that you don't need. So I'm guessing when I transferred to this other unit.

Q: Would you be the one that would actually destroy the notes?

A: Yes.

At the conclusion of the hearing the circuit court ruled that Rodrigues "voluntarily, knowingly, [and] intelligently gave the statements indicated [to Motooka and Detective Kanemitsu]."

Detective Kanemitsu testified on the same day as part of the prosecution's case-in-chief. He again addressed the circumstances of Rodrigues's December 19, 2001 police interview, including the facts that Rodrigues had not requested an attorney, had been briefed fully as to his rights, and had given a full statement without Detective Kanemitsu having made any threats or promises or employed any coercion.

The prosecution then asked Detective Kanemitsu the following:

Q: Did you—after you took Mr. Rodrigues'[s] statement—... what is your general practice with respect to interviewing individuals under these circumstances with respect to tape-recording statements?

A: For myself, basically, I would read them their rights, discuss what the case was about; and then ask them if they wouldn't mind[ ] having them— their statement tape-recorded *so I wouldn't get any facts mixed up or anything like that.*

Q: Okay. What was Mr. Rodrigues'[s] response with respect to whether or not he was okay with the conversation being tape-recorded?

A: As I recall, he did not wish to be tape-recorded.

Q: *During the interview process, Detective Kanemitsu, did you take notes?*

A: *Yes, I did.*

Q: *And were those notes incorporated into your police report?*

A: *Yes, sir.*

Q: .... *Was it your practice to type or create a report as to the conversation that you would have with the witness or a suspect that same day as you spoke with that person?*

A: *Yes, as a usual practice.*

(Emphasis added.) Rodrigues concedes that he did not object at the time to the question or response concerning his refusal to be tape-recorded.

On cross-examination, defense counsel picked up the thread, dwelling extensively on Detective Kanemitsu's note-taking procedures:

Q: The notes that you made from the conversation you had with Mr. Rodrigues in December of 2001, do you have those notes?

A: No, I do not.

....

Q: .... You related that you normally try to transpose the notes into a report on the same day that you take the notes, is this correct?

A: Yes.

Q: Are there instances where you don't get to transpose the notes into the computer until the next day or [a] couple of days later?

A: In the case of me being ... a Detective, it was normal practice for me to type my notes as I've gotten statements or as I get statements. Prior to, as a patrol man, the day might be drawn out where you might talk to several suspects, and you might have to—

Q: Okay. Let me ask you the question then[,] as a detective[,] ... whether there are any instances where it could be the [latter].

A: I do not recall, but it is possible.

Q: ... [Y]our notes, ... do you take shorthand?

A: No, I do not.

Q: Okay. So ... you're just trying to jot down ideas as you—

A: I take down primary components of a statement, I guess you could say, or the main—what he's actually telling me, whoever I interviewed.

Q: Okay. Is it in an outline form or—

A: There's no real form to it, I guess.

Rodrigues testified the next day and essentially reiterated the statement that he had given Detective Kanemitsu. He did, however, contradict Detective Kanemitsu's testimony concerning the trailer that accompanied the welder, maintaining that, when he complained about its run-down condition, Tony had offered to provide a friend's trailer upon which Rodrigues could transport the machine. He testified that, on the day he received the welder and alternate trailer from Tony, he hoisted the welder onto his truck at the HC & S shop, discovering in the process that the trailer was stainless steel. On the same day, he chopped up and discarded a different, older trailer of his own, keeping only the spindles, and then called Tony to inform him that the stainless steel trailer could be picked up, whereupon Tony informed Rodrigues that he could keep it.

During closing arguments, defense counsel again questioned the accuracy of Detective Kanemitsu's notes:

I believe Mr. Kanemitsu, in taking notes, didn't hear everything that was being said. Just like the judge told you, when you're listening to testimony, you know, don't get so into taking notes that you miss testimony. The statement that Detective Kanemitsu got was basically purchased [sic] from Tony for X amount of dollars and somehow it got to where—and he did mention old military trailer and spindles supposedly with Rey. . . . I believe he heard spindles, wrote down spindles, old military trailer. He somehow got, when he transposed all this into his notes, whenever—from notes, which we don't have the benefit of, to a brief report, that the spindles ended up with Rey rather than the trailer.

On April 12, 2004, the jury found Rodrigues guilty of theft in the second degree. On June 15, 2004, the circuit court entered a judgment of conviction and sentence.

Rodrigues filed a timely notice of appeal on July 9, 2004.

## II. *STANDARD OF REVIEW*

 If defense counsel does not object at trial to prosecutorial misconduct, this court may nevertheless recognize such misconduct if plainly erroneous. "We may recognize plain error when the error committed affects substantial rights of the defendant." *State v. Cordeiro*, 99 Hawai'i 390, 405, 56 P.3d 692, 707 (2002) (citations and internal quotation marks omitted). *See also* Hawai'i Rules of Penal Procedure . . . Rule 52(b) (2003) ("Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court."). We will not overturn a defendant's conviction on the basis of plainly erroneous prosecutorial misconduct, however, unless "there is a reasonable possibility that the misconduct complained of might have contributed to the conviction." *State v. Rogan*, 91 Hawai'i 405, 412, 984 P.2d 1231, 1238 (1999). *State v. Wakisaka*, 102 Hawai'i 504, 513, 78 P.3d 317, 326 (2003). "[T]he decision to take notice of plain error must turn on the facts of the particular case to correct errors that 'seriously affect the fairness, integrity, or public reputation of judicial proceedings.'" *State v. Fox*, 70 Haw. 46, 56, 760 P.2d 670, 676 (1988) (quoting *United States v. Atkinson*, 297 U.S. 157, 160, 56 S.Ct. 391, 80 L.Ed. 555 (1936)). Nevertheless, this court's "'power to deal with plain error is one to be exercised sparingly and with caution because the plain error rule represents a departure from a presupposition of the adversary system—that a party must look to his or her counsel for protection and bear the cost of counsel's mistakes.'" *State v. Aplaca*, 96 Hawai'i 17, 22, 25 P.3d 792, 797 (2001) (quoting *State v. Kelekolio*, 74 Haw. 479, 515, 849 P.2d 58, 74–75 (1993)).

## III. *DISCUSSION*

### A. *The Parties' Arguments*

 On appeal, Rodrigues asserts that, by refusing to repeat his statement on tape to

Detective Kanemitsu, he was asserting his right to remain silent.[9] He concedes the rule, in *State v. Alo*, 57 Haw. 418, 425, 558 P.2d 1012, 1016 (1976), that the prosecution may properly inquire on cross-examination into a defendant's earlier silence if the defendant has created, through testimony at trial, the impression that he or she has fully cooperated with police from the beginning and offers exculpatory testimony at trial. He maintains, however, that, by posing a question to Detective Kanemitsu on direct examination concerning Rodrigues's refusal to make a taped statement, a question the answer to which the prosecution already knew, it was improperly commenting on his refusal to testify by "seeking to present evidence of Rodrigues['s] refusal[ ] as a negative inference of his credibility," thereby depriving him of a fair trial.

Rodrigues also concedes that he did not object to the prosecution's inquiry during trial; he therefore asks this court to notice plain error and reverse his conviction. He does not otherwise contest the validity or voluntariness of the statement that he gave to Detective Kanemitsu.

The prosecution counters that Rodrigues never invoked his right to remain silent, but merely expressed his desire that his voluntary statement to police not be memorialized on audio tape; in other words, the prosecution emphasizes that Rodrigues never requested an attorney and never informed Detective Kanemitsu that he did not wish to make any further statements, only that he would not speak on tape.

### B. On The Facts In The Record, Rodrigues Invoked His Right To Remain Silent.

Only two published cases in the nation have dealt with the question whether refusing to be audiotaped during a police interview is tantamount to an invocation of a defendant's right to remain silent, such that

evidence, proffered by the prosecution, of the refusal is inadmissible at trial. Rodrigues cites to *State v. Woods*, 249 Neb. 138, 542 N.W.2d 410 (1996), wherein the Nebraska Supreme Court concluded that "[a] defendant's refusal to give a statement constitutes 'silence,' regardless of whether the defendant has previously given a statement to police. As a result, use of the police officer's statement about [the defendant's] refusal to give a tape-recorded statement was fundamentally unfair and constitutes a violation of due process." *Id.* at 415 (declaring it erroneous for the intermediate court of appeals to deem harmless the prosecution's inquiry on direct examination into whether the defendant had agreed to follow her voluntary oral statement to police with a taped statement).

In *Ball v. State*, 347 Md. 156, 699 A.2d 1170 (1997), however, Maryland's highest court perceived no error in a lower court's conclusion that, by giving a voluntary statement to police but refusing to allow it to be audiotaped, the defendant had not invoked his right to remain silent. *Id.* at 1182 (noting that the defendant indicated *at the outset* that he did not want to talk on tape but was otherwise willing to continue the interview with police).

Following his refusal to be audiotaped, Rodrigues did not retract any part of his statement, nor did he request an attorney. He gave no indication that he would no longer speak with Detective Kanemitsu, but only that he would not repeat what he had said on tape.

Nevertheless, it is equally true that, having given a full and voluntary statement to Detective Kanemitsu, Rodrigues declined to repeat the statement on tape. As far as can be determined from the record, the interview then ended, and, from that point on, Rodrigues did not speak again with police until he invoked his right to counsel the following January.

---

9. This court has recognized that " 'having an electronic recording of all custodial interrogations would undoubtedly assist the trier of fact in ascertaining the truth.' Such a recording 'would be helpful to both the suspect and the police by obviating the "swearing contest" which too often arises.' " *State v. Crail*, 97 Hawai'i 170, 179, 35 P.3d 197, 206 (2001) (quoting *State v. Kekona*, 77

Hawai'i 403, 409, 412, 886 P.2d 740, 746, 749 (1994) (Levinson, J., concurring and dissenting). There is some irony, therefore, in the fact that Rodrigues prevented the police from creating the electronic record that would have aided him in his claims that Detective Kanemitsu inaccurately recorded his statement.

The record is not clear as to whether Rodrigues, following his refusal to be audiotaped, would have willingly continued to respond to Detective Kanemitsu's questions had he been asked any. Nevertheless, the record before us is more closely analogous to that in *Woods,* wherein the defendant refused to follow her voluntary oral statement to police with a taped *reiteration* of that confession, 542 N.W.2d at 413–14, than to *Ball,* wherein the defendant voluntarily continued his conversation with police following his refusal, articulated at the *outset* of the interview, to be taped, 699 A.2d at 1182.

This court has noted that " '[t]he mere fact that [a defendant] may have answered some questions or volunteered some statements on his own does not deprive him of the right to refrain from answering any further inquiries until he has consulted with an attorney and thereafter consents to be questioned,' " *State v. Hoey,* 77 Hawai'i 17, 33, 881 P.2d 504, 520 (1994) (quoting *Miranda,* 384 U.S. at 445, 86 S.Ct. 1602). It therefore follows from the reasoning of *Woods* that when the questioning of a suspect is otherwise complete, and the police request that the suspect reiterate his or her statement in order to memorialize it electronically, the suspect's refusal to do so amounts to an invocation of the right to remain silent precisely because the suspect is refusing to speak further on the matter.[10] As such, the prosecution may not adduce evidence at trial, through the direct examination of the defendant or the police interrogator, of the defendant's refusal to make what amounts to a second statement in order to generate an inference of the defendant's guilt or to impeach the defendant's credibility.

■ On the other hand, and pursuant to *Ball,* the mere refusal at the outset to allow an interview, conducted in accordance with the requirements of *Miranda,* to be electronically recorded does not render any part of the suspect's statement inadmissible. If the refusal to permit the interview to be electronically recorded is incidental to the suspect's general willingness to speak with police and answer questions, there is no invocation of a right to remain silent.

We therefore conclude that Rodrigues *did* invoke his right to remain silent, not because he refused to make a statement *on tape,* but because that refusal appears to have caused a termination of all questioning by the police and acted as a *de facto* invocation of his right to refrain from answering further inquiries.

## C. The Elicited Statement Was Not A Comment On Rodrigues's Refusal To Testify.

■ "As a rule, the prosecution may not comment on a defendant's failure to testify." *Wakisaka,* 102 Hawai'i at 514–15, 78 P.3d at 327–28 (2003) (citing *Chavez v. Martinez,* 538 U.S. 760, 768–69, 123 S.Ct. 1994, 155 L.Ed.2d 984 (2003)). Nevertheless, such a comment by the prosecutor will be deemed improper only "if that comment was 'manifestly intended or was of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify.' " *Id.* at 515, 78 P.3d 317, 78 P.3d at 328 (quoting *State v. Padilla,* 57 Haw. 150, 158, 552 P.2d 357, 362 (1976), *also quoted in State v. Valdivia,* 95 Hawai'i 465, 482, 24 P.3d 661, 678 (2001); *State v. Melear,* 63 Haw. 488, 496, 630 P.2d 619, 626 (1981)).

■ In the present matter, the prosecution merely elicited the fact, without further comment, that, following a full, voluntary explanation of how he came to possess the welder and trailer, Rodrigues declined to agree to an audiotaped reiteration of his statement to Detective Kanemitsu. On the record before us, it is apparent that the question was posed, and the information elicited, as part of the prosecution's effort to maximize the reliability of Detective Kanemitsu's recollections and to explain why the detective could only rely on his notes and not an audiotape of the interview, that is, because Rodrigues declined to make such a tape. And the prosecutor's question, part of a line of inquiry designed to establish the

---

10. By contrast, and by way of illustration, if, at the conclusion of an interrogation, a suspect were to decline to make an electronically recorded statement but were otherwise willing to review the substance of the interview and to assist the police interrogator in clarifying the written notes of the conversation, the suspect would not be invoking his or her right to remain silent because the suspect would not be expressing any wish to do so.

**50**

detective's custom and practice regarding accurately transcribing such statements, was unaccompanied by any implication of guilt with respect to Rodrigues's unwillingness to be audiotaped. *Cf. United States v. Ortiz,* 776 F.2d 864, 865 (9th Cir.1985) ("Even if the prosecutor was in some degree remiss [in commenting on defendant's pre-trial silence concerning exculpatory testimony], the incident would not justify a reversal. If the statement was a comment on silence, it was indirect; no inference of guilt was suggested.").

We therefore hold that the information elicited from Detective Kanemitsu was not "manifestly intended or . . . of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify." *Wakisaka,* 102 Hawai'i at 515, 78 P.3d at 328.

**D.** *However The "Comment" Is Characterized, The Circumstances Of The Present Matter Do Not Justify Invocation Of The Plain Error Doctrine.*

**1.** *There is no reasonable possibility that any unwarranted "comment" contributed to the verdict.*

Even assuming *arguendo* that the "comment" elicited by the prosecution was improper, the prosecutor's conduct in the present matter did not prejudice Rodrigues's substantial rights in that there is no "reasonable possibility that the misconduct complained of might have contributed to the conviction," *Rogan,* 91 Hawai'i at 412, 984 P.2d at 1238, *quoted in Wakisaka,* 102 Hawai'i at 513, 78 P.3d at 326.

In deciding whether a prosecutor's reference in its case-in-chief to a defendant's post-arrest silence was prejudicial, the United States Court of Appeals for the Ninth Circuit, in *United States v. Whitehead,* 200 F.3d 634 (9th Cir.2000), "consider[ed] [ (1) ] the extent of [the allegedly prejudicial] comments made by the witness, [ (2) ] whether an inference of guilt from silence was stressed to the jury, and [ (3) ] the extent of other evidence suggesting [the defendant's] guilt." *See id.* at 639 (citing *Guam v. Veloria,* 136

F.3d 648, 652 (9th Cir.1998)). All three factors are pertinent in the present analysis.

**a.** *The extent of the comment and any inference of guilt stressed to the jury*

Detective Kanemitsu testified extensively regarding his investigation, including his conversations with Rey and Miyagawa, as well as the voluntary and cooperative approach taken by Rodrigues. The comments that Rodrigues now challenges were cursory, in response to a reasonable line of questioning, and, in context, incidental. Furthermore, as noted *supra* in section III.C, Detective Kanemitsu's testimony did not entail any inference of guilt from silence on Rodrigues's part; *a fortiorari,* no such inference was "stressed to the jury." *Id.*

**b.** *The extent of other evidence suggesting guilt*

Rodrigues does not dispute that his statements to Motooka and to the police were given knowingly, intelligently, and voluntarily. He had a full opportunity at trial to elaborate on the voluntary and willing quality of his cooperation with both Motooka and the police in the days following the identification of the welder, to elaborate on the circumstances of the police interview, to challenge the accuracy of Detective Kanemitsu's recollection of his December 19, 2001 statement, and to set before the jury his version of events.

Detective Kanemitsu testified both that Rodrigues denied that the trailer he obtained from Tony was composed of stainless steel and that Rodrigues told him that he had dismantled it, saving only the spindles. At trial, the testimony of Cambra, Miyagawa, and Detective Kanemitsu identified the trailer that Rodrigues brought to Miyagawa's home as the stolen stainless steel HC & S trailer. At trial, Rodrigues maintained that he had, in fact, dismantled a different, unidentified trailer and had kept the trailer supplied by Tony, but conceded that it was indeed composed of stainless steel. He further testified that Tony had informed him the day that he had taken possession of the stainless steel trailer that he could keep it.

Miyagawa testified, however, that Rodrigues told him, while the trailer was stored at Miyagawa's house, that it was only on loan and was to be returned, only later asking Miyagawa's assistance in selling it for $1500.00. Rodrigues denied telling Miyagawa that he wanted $1500.00 for the trailer, but did not otherwise contradict Miyagawa's testimony. The jury was also aware that Rodrigues never attempted to cull HC & S employment files for Tony's contact information and that he never requested call records from Verizon in order to locate Tony's telephone number.

Given the full opportunity afforded Rodrigues to set before the jury both his version of events and his explanation of any inconsistencies between his testimony and that of third-party witnesses such as Miyagawa and Kanhai, as well as the extensive testimony of Rodrigues, Cambra, Motooka, and Miyagawa over a three-day trial, there is no reasonable possibility that the cursory testimonial statement in question by Detective Kanemitsu might have contributed to Rodrigues's conviction.

2. *The alleged error did not "seriously affect the fairness, integrity, or public reputation of judicial proceedings."*

A finding of plain error in the present matter is also unwarranted because the conduct in question does not "seriously affect the fairness, integrity, or public reputation of judicial proceedings," *Fox,* 70 Haw. at 56, 760 P.2d at 676.

The prosecution may properly inquire on cross-examination into a defendant's earlier invocation of the right to remain silent if the defendant has created, through testimony at trial, the impression that he or she fully cooperated with police. *See Alo,* 57 Haw. at 425, 558 P.2d at 1016. In the present matter, had the prosecution raised the issue of Rodrigues's refusal to make an audiotaped statement either on redirect examination of Detective Kanemitsu or on cross-examination of Rodrigues, the questioning clearly would have been allowable as manifestly intended to rebut (1) defense counsel's effort to create in the jury the impression that Rodrigues had fully cooperated with the police and (2)

the implication (a) that Detective Kanemitsu's recollection of the details of Rodrigues's statement was inaccurate due to flawed police procedures and, therefore, (b) that the fault for any inconsistency between Rodrigues's testimony and that of the detective should be laid squarely at the feet of the police.

Correlatively, a finding of plain error is generally unwarranted where the failure to object at trial is a function of trial counsel's strategic decisions. *See United States v. Seibert,* 121 Fed.Appx. 715, 715–16 (9th Cir. 2005) (concluding there was no plain error because, *inter alia,* "without objection, the trial judge could not know whether the defense attorney was purposely withholding objection to objectionable material, in order to lead the prosecution into something that would open up useful evidence for the defense"). Nor is plain error produced where "the appellant's attorney intentionally elicited the same testimony on cross-examination," *Pennsylvania v. Howard,* 226 Pa.Super. 22, 312 A.2d 54, 57 (1974) (refusing to find plain error where the appellant's trial counsel "succeeded in repeating on cross-examination" the testimony now being complained of).

In the present matter, it is reasonably clear that Rodrigues's attorney did not object at trial to the prosecution's line of questioning on the taking of his client's statement because, as a matter of trial strategy, he hoped to expand on the issue during cross-examination in order to impeach the accuracy of the detective's recollection, a course defense counsel in fact pursued via his lengthy interrogation on the subject, *see supra* section I.

Accordingly, we do not believe that the present matter warrants an invocation of this court's plain error doctrine.

## IV. *CONCLUSION*

In light of the foregoing, this court affirms the circuit court's June 15, 2004 judgment.

Acoba, J., concurs in the result only.